IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**HAPPY STOMPINGBEAR**                                                                      **PLAINTIFF**
**ADC #651503**

V.                          NO. 4:18-cv-00827-KGB-ERE

**WENDY KELLEY,** *et al.*                                                                 **DEFENDANTS**

### RECOMMENDED DISPOSITION

**I.    Procedure for Filing Objections**

This Recommendation has been sent to United States District Judge Kristine G. Baker. Any party may file objections if they disagree with the findings or conclusions set out in the Recommendation. Objections should be specific and include the factual or legal basis for the objection.

Objections must be filed within 14 days. If you don't object, you risk waiving the right to appeal questions of fact. If no objections are filed, Judge Baker can adopt this Recommendation without independently reviewing the record.

**II.   Introduction**

On November 5, 2018, Arkansas Division of Correction ("ADC") inmate Happy Stompingbear, also known as Christopher Ward, filed this § 1983 action against multiple ADC officers and chaplains, alleging that they had repeatedly denied his requests for religious accommodation in violation of the First Amendment

and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). *Doc. 1 at 9-10*.

On April 5, 2019, Mr. Stompingbear filed an amended complaint (*Doc. 77*), which remains his operative pleading. Subsequently, his clams have narrowed, voluntarily (*Docs. 75, 76*) or pursuant to Court Orders specifying exhausted claims that may go forward. *Docs. 116, 160, 187, 289 at 2 n.4*.

The remaining Defendants are ADC chaplains Paul Fulks, Jeffrey Henig, Sean Treas, and Joshua Mayfield and ADC officers Steven Williams, Randel Watson, Grant Harris, and Marvin Evans. Mr. Stompingbear alleges that: (1) Defendants Fulks, Mayfield, Williams, and Evans failed to accommodate his requests for group worship; (2) Defendants Fulks, Henig,[1] Treas, and Watson failed to accommodate his requests for tarot cards; and (3) Defendant Harris failed to provide him a job assignment consistent with his religious beliefs.[2]

Mr. Stompingbear sues each Defendant in his individual and official

---

[1] The Court previously described Mr. Stompingbear's claim against Defendant Henig in general terms as a failure to respond to his requests for accommodation. *Doc. 289 at 3*. Further review of the operative grievance clarifies that Mr. Stompingbear's claim is that Defendant Henig failed to accommodate his request for tarot cards. See *Doc. 298-2 at 3, 5*.

[2] In their supplemental motion for summary judgment, Defendants correctly argue that, although Mr. Stompingbear fully exhausted his claims against Major Claudia Harris raised in grievance VSM-17-542 (*Doc. 148-5 at 5-12*), Claudia Harris is not a defendant in this lawsuit. Rather, Grant Harris remains a Defendant in this case. Because Mr. Stompingbear raised claims against Claudia Harris, rather than Grant Harris, in grievance VSM-17-542, the claims raised in that grievance are not relevant to the claims pending in this lawsuit, and Mr. Stompingbear's claims against Defendant Grant Harris should be dismissed.

2

capacities (*Doc. 77 at 7*), seeking both money damages and injunctive relief allowing him to: (1) lead group worship services once a week; and (2) possess the tools that he deems necessary to practice his religion. *Id. at 14*.

Pending before the Court are: (1) Mr. Stompingbear's motion for summary judgment against Defendants Joshua Mayfield, Steven Williams, and Marvin Evans (*Doc. 244*), supporting brief (*Doc. 245*), and statement of facts (*Doc. 246*);[3] (2) Defendants Evans, Mayfield, Williams, and Fulks' motion for summary judgment (*Doc. 256*), supporting brief (*Doc. 258*), and statement of facts (*Doc. 257*); (3) Defendant Fulks, Harris, Henig, Treas and Watson's supplemental motion for summary judgment (*Doc. 298*),[4] supporting brief (*Doc. 300*), and statement of facts (*Doc. 299*); and (4) Mr. Stompingbear's responses in opposition to Defendants'

---

[3] In support of Mr. Stompingbear's motion for summary judgment, he repeats allegations set forth in his amended complaint--that Defendants denied his repeated requests for religious accommodation. *Doc. 245 at 2*. He also submits an assortment of documents, including multiple affidavits that describe his religion and beliefs. *Doc. 246 at 4-134*. In addition, in support of his motion and in opposition to Defendants' first motion for summary judgment, Mr. Stompingbear argues that Defendants treat Pagan inmates less favorably than Christians and have established a "favored deity." *Doc. 245 at 4; Doc. 284 at 2*.
 There is no dispute that several Defendants denied Mr. Stompingbear's requests for group worship on the basis of ADC policies. But as explained in this Recommendation, Mr. Stompingbear shoulders the burden to show that Defendants placed a substantial burden of his religious exercise, and he fails to meet that burden. To the extent that Mr. Stompingbear attempts to raise claims under the Equal Protection Clause or the Establishment Clause, such claims are not at issue in this case.

[4] On May 6, 2022, Defendants Mayfield, Evans, Williams, and Fulks moved for summary judgment on the merits of all remaining claims. However, their motion did not address all remaining claims, and Defendants Watson, Henig, Harris and Treas did not join the motion. Given the complicated history of the case and the likelihood that Defendants had inadvertently neglected to address all remaining claims, the Court gave Defendants an opportunity to file a supplemental motion, which Defendants did on November 13, 2022. *Docs. 312, 303, 304*.

motions for summary judgment. *Docs. 284, 302, 303, 304*. The motions are now ripe for review.

For the reasons explained below, Defendants' motion for summary judgment and supplemental motion for summary judgment should be granted, and Mr. Stompingbear's motion should be denied.

### III. <u>Summary Judgment Standard</u>

Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Once that has been done, the nonmoving party must come forward with specific facts demonstrating that there is a material dispute for trial. See Fed. R. Civ. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). A party is entitled to summary judgment if - but only if - the evidence shows that there is no genuine dispute about any fact important to the outcome of the case. See Fed. R. Civ. P. 56; *Odom v. Kaizer*, 864 F.3d 920, 921 (8th Cir. 2017).

## IV. Facts Without Material Dispute[5]

Mr. Stompingbear, a self-proclaimed Pagan,[6] filed this lawsuit in 2018, while housed at the ADC's Ouachita River Unit ("ORU"). And he is currently housed at the East Arkansas Regional Max Unit ("EARU Max"). His claims, however, concern requests for religious accommodations he made while housed at ADC's Tucker, Varner, and Varner Supermax Unit ("VSM") Units.[7] *Doc. 2 at 9*. He asserts that Defendants violated his right to free exercise of religion under both the First Amendment and RLUIPA by failing to accommodate his requests for group worship and tarot cards. In deposition, he explained that he wants the freedom to meet with other Wiccans to perform rituals or services; (2) spread tarot cards across his bed and read them; and (3) read tarot cards with other inmates. *Doc. 256-6 at 6*.

---

[5] Unless otherwise noted, these facts are taken from: (1) Mr. Stompingbear's original complaint (*Doc. 2*); (2) Mr. Stompingbear's amended complaint (*Doc. 77*); (3) the declaration of non-party Michelle Gray (*Doc. 256-15*); (4) excerpts from Mr. Stompingbear's deposition transcript (*Doc. 256-6*); (5) the Defendants' discovery responses (*Doc. 256-5*); (5) the 2021 declaration of Defendant Mayfield (*Doc. 256-8*); and (6) the 2022 declaration of Defendant Mayfield (*Doc. 256-13*).

[6] *Doc. 77 at 10; Doc.256-13 at 2.*

[7] By declaration, Michelle Gray, Warden of ADC's North Central Unit ("NCU") provides the following information about Mr. Stompingbear's housing assignments: (1) he was assigned to the Tucker Unit until his transfer to the VSM Unit on December 31, 2015; (2) he remained at VSM until March 25, 2016, when he was transferred to the Varner Unit; (3) he remained housed at either the Varner Unit or VSM until October 17, 2017, when he was transferred to the ORU; (4) he remained housed at the ORU until November 9, 2020, when he was transferred to the NCU; (5) he was transferred back to the ORU on August 13, 2021 but transferred back to NCU on August 18, 2021; and (6) he remained at the NCU until April 21, 2022, when he was transferred to EARU Max. *Doc. 256-14 at 1*.

Mr. Stompingbear's opportunities for group worship and the use of tarot cards are impacted by ADC policies that: (1) permit inmates to participate in group worship services, provided that an approved, free-world sponsor is present to lead such activities; and (2) limit the use of tarot cards to a designated area in the chapel. See *Docs. 256-1, 256-13*. Mr. Stompingbear faults Defendants' conduct in implementing and administering these policies in connection with his requests for religious accommodation.[8] See *Doc. 77 at 10*.

A. **Group Worship**

Mr. Stompingbear's claim that Defendants failed to accommodate his requests for group worship involve his assignment to the Tucker Unit in 2014 and 2015.[9] During that period, he submitted multiple grievances complaining about the lack of group worship services for Pagans. See *Doc. 148-3 at 3, 8-13, 27-33, 60-37*. The responses to each grievance cite ADC policy requiring group religious services to

---

[8] An inmate may bring two types of First Amendment challenges to prison policies: facial and as-applied. *Sisney v. Kaemingk*, 886 F.3d 692, 697–98 (8th Cir. 2018). Mr. Stompingbear does not present a facial challenge to the ADC policies at issue or seek to have them invalidated as overbroad. See *id.* (explaining that "a law may be overturned as impermissibly overbroad because a substantial number of its applications are unconstitutional). Instead, his allegations and the individualized relief he seeks show that his complaint is with Defendants' implementation of the policies, specifically in response to his requests for group worship and tarot cards.

[9] Mr. Stompingbear's fully exhausted grievances related to his group-worship claims are as follows: (1) TU-15-801 (*Doc. 148-3 at 60-67*); (2) TU-14-148 (*Doc. 148-5 at 5-12*); (3) TU-14-293 (*Doc. 148-3 at 8-13*); and (4) TU-14-393 (*Doc. 148-3 at 27-33*); and (5) TU-14-387 (*Doc. 148-3 at 19-26*). Based on these grievances, this claim is confined to events that occurred during Mr. Stompingbear's incarceration at the Tucker Unit in 2014 and 2015.

be under the direction of an approved, free-world sponsor. *Id*.

In response to a 2014 grievance, Defendant Mayfield stated that he had been trying to recruit a Wiccan/Pagan sponsor since 2010, but no one was willing to serve, and he would keep trying. *Id. at 29*. In response to a 2015 grievance, Defendant Fulks told Mr. Stompingbear that he had searched for a Pagan sponsor, with no success, and he would continue his search. *Doc. 148-3 at 64*. In addition, Defendant Fulks requested that Mr. Stompingbear notify him about potential sponsors. *Id*. In deposition, Mr. Stompingbear testified that during his incarceration, he has written one free-world Wiccan, Tammy Allgood, to request assistance in group worship, but she was unavailable. Doc. 256-6 *at 11-12*.

In response to interrogatories, Defendant Fulks recounts that he wrote to several free-world Pagan leaders to assist with Pagan religious services while Mr. Stompingbaer was housed at the Tucker Unit, but he was unable to locate any individuals willing to do so. *Doc. 256-5 at 28*.

B. **Tarot Cards**

Several grievances submitted by Mr. Stompingbear in 2015 and 2016, during his incarceration at the Tucker, Varner, and VSM Units, concern tarot cards.[10] In 2015, while housed at the Tucker Unit, he filed a grievance complaining that he had

---

[10] Mr. Stompingbear's fully exhausted grievances related to his concerns regarding tarot cards are as follows: (1) TU-15-749 (*Doc. 148-3 at 53-59*); (2) VU-16-501 (*Doc. 148-6 at 23-28*; and (3) VSM-16-3296 (*Doc. 148-6 at 64-69*).

not been permitted to use his tarot cards for months. *Doc. 256-3 at 33*. He explained that the cards were stored under the chaplain's control, and the chaplain's "busy schedule" prevented him from accessing and using the cards. *Id.* Defendant Fulks' written response to the grievance reads:

> I cannot give you your Tarot Cards as this is a security matter. I cannot override security decisions. However, recognizing the importance of the Tarot Cards in practicing your religion, I will do whatever I can to accommodate your use of them in the Chapel as permitted by security. Please tell me times and days your need to make use of them, and I will do my best to schedule chaplaincy coverage so you can use them.

*Id.* In deposition, Mr. Stompingbear testified that he notified Defendant Fulks that he was available anytime, but he acknowledged that he failed to provide Defendant Fulks with the requested specific dates and times. *Doc. 256-6 at 10*.

In answering requests for admissions, Defendant Fulks stated that on one occasion at the Tucker Unit, he assisted Mr. Stompingbear in procuring tarot cards. *Doc. 256-5 at 19-20*. Defendant Fulks recalled that Mr. Stompingbear used the cards once in the chapel and removed them from the chapel in violation of ADC policy. *Id. at 20, 29*. As a result, ADC officials confiscated the cards. *Id. at 20*.

In 2016, after his transfer to the Varner Unit, Mr. Stompingbear filed a grievance complaining that he had not received tarot cards that he had at the Tucker Unit and asking, "Where are my tarot cards?" *Doc. 148-6 at 22*. In a second grievance, Mr. Stompingbear complained that he that he had not received responses from the chaplains. *Id. at 23*. However, a written decision denying the second

8

grievance stated that Defendant Henig reported that he had responded to the first grievance and told Mr. Stompingbear that his tarot cards were not in the chapel. *Id*. In addition, the decision informed Mr. Stompingbear that ADC policy prohibited the use of tarot cards outside of the chapel area. *Id. at 25*.

There is no evidence in the record that Mr. Stompingbear ever requested to check out tarot cards at VSM in accordance with ADC policy. However, he filed a grievance complaining that a VSM correctional officer confiscated his tarot cards and told him that they were required to be stored in the chapel. *Doc. 148-6 at 41*.

In response to a request for admission asking Defendant Henig to admit that he allowed Mr. Stompingbear to use his tarot cards only once, Defendant Henig explained that he does not recall that Mr. Stompingbear ever requested to check out tarot cards from the chapel while housed at VSM. *Doc. 256-5 at 16*.

Defendant Treas, in response to an interrogatory asking him why he did not permit Mr. Stompingbear to use his tarot cards, stated:

> I do recall Plaintiff coming to the Chapel at Varner, but I do not recall him ever having cards or having them sent to the Chapel. Another inmate who was Wiccan came to the Chapel and used donated cards and left them in the Chapel according to policy. I discussed this with Stompingbear[,] and he said that he would not be agreeable to using someone else's cards as I understood it. I talked to him twice. I brought this donated set up to him. He said that tarot cards are very personal and it would be negative if he used them[,] was my understanding from him.

*Doc. 256-5 at 41*.

In November 2020, after Mr. Stompingbear filed this lawsuit, he was

9

transferred to ADC's North Central Unit ("NCU"), where he remained until April 21, 2022.[11] In his deposition, taken December 4, 2020. Mr. Stompingbear acknowledged that he had not inquired whether the NCU chapel had tarot cards. *Doc. 256-6 at 17*.

By declaration dated January 21, 2021, NCU Chaplain Patrick McCown stated that the NCU chapel had a tarot card set, but Mr. Stompingbear had never requested the cards for use in the chapel. *Doc. 256-9 at 1*. Chaplain McCown stated that Mr. Stompingbear only sought to possess the tarot cards in his cell, which ADC policy prohibited. *Id*.

On January 1, 2021, Mr. Stompingbear filed a grievance complaining that "the way" the ADC's tarot card policy had "been administered" prevented him from using his cards "as needed." He also complained about the requirement that he donate his cards to the chapel because "tarot cards are very personal." *Doc. 256-4 at 2*.

In response to Mr. Stompingbear's grievance, Chaplain McCown issued a memorandum dated January 8, 2021, suggesting a solution:

> I have no problem with keeping the cards that Happy Stompingbear uses separate from all other tarot cards in order to respect the personal nature of this religious practice. When possible, I will see that only this

---

[11] Mr. Stompingbear's incarceration at NCU was interrupted by a five-day period when he was housed at the Ouachita Regional Unit from August 13 through 18, 2021. *Doc. 256-14 at 1*.

> inmate uses the cards he donated. I cannot deny other inmates' access to the cards[,] but I have other tarot cards that have been donated which other inmates can use when possible.

*Doc. 256-4 at 1*. According to Chaplain McCown's declaration, as of January 21, 2021, Mr. Stompingbear still had not requested to use tarot cards in the chapel, and the current record provides no evidence he ever did.[12]

## V. Analysis

Defendants argue that: (1) Mr. Stompingbear's official capacity claims seeking money damages are barred by sovereign immunity; and (2) they are entitled to qualified immunity.[13]

### A. Sovereign Immunity

A civil litigant cannot recover money damages from state actors sued in their

---

[12] Mr. Stompingbear's claims do not arise from events that occurred during his incarceration at NCU. However, evidence that he never attempted to use tarot cards while housed at NCU, even after Chaplain McCown suggested a plan to address his grievance about communal cards, is relevant to whether ADC's tarot card policy imposed a substantial burden on Mr. Stompingbear's religious exercise.

[13] Qualified immunity shields government employees sued in their *individual capacities* from *money damages* "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Mr. Stompingbear's individual-capacity claims come under both the First Amendment and RLUIPA, and it is not clear that RLUIPA authorizes claims for money damages against defendants sued in their individual capacities. See *Jones v. Hobbs*, No. 5:09-CV-00157-JLH-JJV, 2010 WL 3909979, at *5 (E.D. Ark. Sept. 13, 2010), *report and recommendation adopted*, 2010 WL 3909951 (E.D. Ark. Oct. 1, 2010) (citing cases holding that RLUIPA does not create a cause of action against individuals for money damages). In any event, it is unnecessary to resolve that question because no reasonable factfinder could conclude on the current record that any Defendant deprived Mr. Stompingbear of his federal constitutional or statutory rights.

official capacities. *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989); *Sossamon v. Texas*, 563 U.S. 277, 293 (2011) ("We conclude that States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver."). Accordingly, Mr. Stompingbear's official-capacity claims seeking money damages are barred by sovereign immunity. However, his official capacity claim for injunctive relief remains.[14]

B. **Merits Review**

Mr. Stompingbear contends that Defendants' actions, related to the administration of ADC policies governing group worship and the possession and use of tarot cards, violated his right to free exercise of religion under the First Amendment and RLUIPA.[15]

Both RLUIPA and the First Amendment protect the free-exercise rights of inmates, but government action challenged under the First Amendment is subject to a less demanding, more "prison-friendly" standard. *Erdahl v. Pirc*, No. 20-3011,

---

[14] Defendants also argue that Mr. Stompingbear's claims for injunctive relief are *moot* based on his transfer to various ADC facilities since filing this lawsuit. However, the same ADC policy applies to each ADC facility where Mr. Stompingbear has been housed, and Mr. Stompingbear also seeks money damage in addition to injunctive relief. Accordingly, this Recommendation continues to address the merits of Mr. Stompingbear's claims.

[15] Mr. Stompingbear's claims against Defendants Mayfield, Williams, and Evans related to group worship are limited to First Amendment claims. See *Doc. 187, 233, 288*. Likewise, his claim against Defendant Fulks related to tarot cards is limited to a First Amendment claim. See *id*.

2021 WL 5365979, at *1 (8th Cir. Nov. 18, 2021) (citing *Gladson v. Iowa Dep't of Corrs.*, 551 F.3d 825, 832–33 (8th Cir. 2009)). Government action that substantially burdens an inmate's ability to practice his religion is valid under the First Amendment if "reasonably related to a legitimate penological interest."[16] *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (quoting *Turner v. Safley*, 482 U.S. 78, 81 (1987)). In contrast, the same government action challenged under RLUIPA must further a "compelling governmental interest" and do so by the "least restrictive means."[17]

Importantly, to avoid summary judgment as to any claim, whether pursuant to the First Amendment or RLUIPA, Mr. Stompingbear "must first raise a material question of fact regarding whether [a Defendant] placed a 'substantial burden' on

---

[16] In assessing whether challenged government action violates the Free Exercise Clause, courts employ a four-factor test: (1) whether there is a "valid rational connection" between the prison regulation and the government interest justifying it; (2) whether there is any alternative means for exercise of the asserted right; (3) whether an accommodation would have "a significant ripple effect" on the guards, other inmates, and prison resources; and (4) whether there is an alternative that fully accommodates the prisoner "at de minimis cost to valid penological interests." *UIP v. Mo. Dep't of Corr.*, 372 F.3d 979, 982-83 (8th Cir. 2004) (quoting *Turner*, 482 U.S. at 89-91).

[17] RLUIPA provides, in relevant part:
No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . , even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
    (1) is in furtherance of a compelling governmental interest; and
    (2) is the least restrictive means of furthering that compelling governmental interest.
42 U.S.C. § 2000cc–1(a).

his ability to practice his religion." *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008) (citation omitted); see also *Gladson*, 551 F.3d at 833 (In summary, when faced with both a [First Amendment] claim and a RLUIPA claim, a court must, as a threshold matter, inquire as to whether the prison has placed a "substantial burden" on the prisoner's ability to practice his religion).

Under the First Amendment, a substantial burden on the free exercise of religion means that the government action at issue

> must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunity to engage in those activities that are fundamental to a person's religion.

*Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008); *Murphy*, 372 F.3d at 988 (quoting *Wir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997)).

The definition of "substantial burden" is altered "somewhat in the RLUIPA context [because] RLUIPA's broad protection of 'religious exercise' extends even to religious practices that are not 'compelled by, or central to' a certain belief system. *Van Wyhe v. Reisch*, 581 F.3d 639, 656 (8th Cir. 2009) (citations omitted). Here, however, Defendants do not question the sincerity of Mr. Stompingbear's beliefs or whether group worship or the use of tarot cards is central or fundamental to is Pagan religion.

Applying a definition of "substantial burden" that comports with the broad protection of religious exercise afforded under RLUIPA, the Court finds that Mr. Stompingbear has failed to come forward with evidence from which any reasonable factfinder could find that any Defendant placed a substantial burden on his religious exercise. Accordingly, it is it unnecessary to address whether the complained-of conduct was reasonably related to a legitimate penological interest, as required under the First Amendment, or the least restrictive means to further a compelling government interest, as required under RLUIPA. *Van Wyhe v. Reisch*, 581 F.3d 639, 657–58 (8th Cir. 2009) (citing *Patel,* 515 F.3d at 813) ("Where an inmate has not put forth sufficient evidence under RLUIPA to demonstrate a substantial burden on his religious exercise, his claim fails under the Free Exercise Clause of the First Amendment as well.").

### 1. Failure-to-Accommodate Group Worship Claim Against Defendants Fulks, Mayfield, Williams, Henig, and Evans

Mr. Stompingbear alleges that he made "countless requests" for religious accommodation, including "group time to celebrate sacred days and . . . fellowship." *Doc. 77 at 10.* Without providing specific dates or describing specific conduct on the part of individual defendants, he states that he received very few responses from Defendants, who ignored his requests and "neglected to prevent the violations from

continuing."[18] *Id*. Mr. Stompingbear provides no evidence that any Defendant failed to respond to his requests or refused to help him find a free-world spiritual leader during his incarceration during the relevant time period.

In contrast, the undisputed evidence shows that Defendants Fulks and Mayfield attempted to recruit a denominational leader to assist with Pagan group worship services, but they were unable to locate an individual willing to do so. *Doc. 256-5 at 28*. Furthermore, Mr. Stompingbear testified that he has only reached out to one free-world advisor during his incarceration.

The law is settled that prisons are not constitutionally required to provide a religious advisor for each group within a prison, but "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty." *Cruz v. Beto,* 405 U.S. 319, 322 n. 2 (1972); see also *Blair-Bey v. Nix*, 963 F.2d 162, 163 (8th Cir. 1992). RLUIPA, likewise, only requires "a reasonable opportunity to engage in religious activities." *Van Wyhe v. Reisch*, 581 F.3d 639, 657 (8th Cir. 2009).

---

[18] In *Mbonyunkiza v. Beasley*, 956 F.3d 1048, 1055 (8th Cir. 2020), the Eighth Circuit concluded that "absent evidence that an underlying prison regulation or policy violates the Free Exercise Clause, evidence that a correction official negligently failed to comply with an inmate's sincerely held religious dietary beliefs [did] not establish a Free Exercise Clause claim under § 1983."

Mr. Stompingbear has failed to point to any evidence showing that Defendants' conduct in enforcing ADC policy denied him reasonable opportunities for group worship. Mr. Stompingbear never asked a Defendant to assist him in finding a free-world sponsor, and his concession that he made only one attempt to recruit a spiritual advisor undermines the claim that Defendants' enforcement of ADC policy substantially burdened his ability to practice his religion.

Based on the evidence before the Court, no reasonable fact-finder could conclude that Defendants placed a substantial burden on Mr. Stompingbear's opportunities for group worship. See *Adkins v. Kaspar*, 393 F.3d 559 (5th Cir. 2004) (holding that (1) outside volunteer requirement for religious assemblies did not place a substantial burden on inmate's religious exercise and (2) no First Amendment or RLUIPA violation occurred where "no volunteer deemed acceptable by defendants was available to supervise the meetings").[19]

---

[19] Even if Mr. Stompingbear met his burden to create a jury question as to whether Defendants' administration of the ADC's group worship policy substantially burden on his religious exercise, his claim would likely fail under RLUIPA's least-restrictive-means standard. In *Tisdale v. Dobbs*, 807 F.2d 734 (8th Cir. 1986), the Court explicitly held that no First Amendment violation arose from the ADC's "refusal to allow Muslim inmates to conduct religious services except under the leadership of an approved free-world sponsor." *Id.* at 736. In granting summary judgment to ADC officials, the Court held that "unsupervised group religious meetings posed a potential threat to a legitimate penological objective," including the concern that such meetings could become "forums for dissension and unrest." *Id.* at 738, 740.

### 2. Failure-to-Accommodate Tarot Cards Claim Against Defendants Fulks, Henig, Treas, and Watson

ADC policy prohibits possession of tarot cards or rune sets outside of the designated chapel area but provides that if those items are donated to the chapel, they will be stored in the chaplain's office for authorized solitary inmate worship in a designated area. *Doc. 256-1 at 7*. Mr. Stompingbear argues that Defendants' administration of this policy placed a substantial burden his religious exercise because: (1) unidentified prison chaplains rejected his requests to check out tarot cards from the chaplain; and (2) if he donated tarot cards to the chaplain, other inmates would likely use them and possibly destroy them. *Doc. 128*.

However, the undisputed evidence shows that: (1) while housed at VSM, Mr. Stompingbear made no visits to the chapel for any purpose, including to check out tarot cards (*Doc. 256-5 at 16*); (2) while housed at the Tucker Unit, Mr. Stompingbear used the tarot cards that Defendants Fulks provided him, but he removed the cards from the chapel in violation of ADC policy (*Id. at 20, 29*); (3) while housed at the Varner Unit, Mr. Stompingbear refused to use another individual's tarot cards that had been donated to the chapel (*Id. at 41*); and (4) while housed at NCU, the Chaplain McCown offered to keep Mr. Stompingbear's tarot cards separate from all other tarot cards, but there is no evidence that Mr. Stompingbear ever requested tarot cards at NCU or accepted Chaplain McCown's offer. *Doc. 256-9 at 1*.

Based on the record before the Court, Mr. Stompingbear had available alternative means by which he could practice his faith by using tarot cards in the chapel, but he never pursued that option. It also appears that he refused Chaplain McCown's offer to accommodate his objection to using communal tarot card. As a result, no reasonable fact-finder could conclude that the Defendants' enforcement of the ADC's policy prohibiting Mr. Stompingbear from possessing tarot cards "on person" places a substantial burden on his ability to practice his religion. See *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807 (8th Cir. 2008) (holding that Muslim prisoner's free exercise rights were not substantially burdened in violation of First Amendment or RLUIPA, where he failed to pursue alternative means of practicing his faith, such has purchasing halal vegetarian entrees on days when kosher meat entrees were unavailable, with money received from his family, or requesting to be first in line at the food bar to avoid cross-contamination). Rather, Mr. Stompingbear's own conduct has resulted in his inability to worship using tarot cards. As a result, Defendants are entitled to judgment as a matter of law.[20]

---

[20] Even if Mr. Stompingbear met his burden to show that Defendants' administration of ADC's tarot card policy substantially burdened his religious exercise, his claim would fail. In *Singson v. Norris*, 553 F.3d 660 (8th Cir. 2009), an ADC inmate specifically challenged the ADC policy requiring inmates to check out tarot cards from a chaplain rather than keeping the cards in their cells as a violation of RLUIPA. The Eighth Circuit rejected the inmate's arguments and upheld the ADC policy. In making the determination, the Court cited multiple security concerns associated with inmates' "unrestricted access to tarot cards," including "gambling, trafficking, psychological control, and gang symbols." *Id*. at 662. The same reasoning applies here.

In this case, Defendants provide the declaration of Superintendent James Gibson (*Doc. 256-10*), who provided testimony in *Singson v. Norris*, *supra,* regarding the threat posed to prison

## VI. Conclusion

IT IS THEREFORE RECOMMENDED THAT:

1. Defendants' motion for summary judgment and supplemental motion for summary judgment (*Docs. 256, 298*) be GRANTED.

2. Mr. Stompingbear's remaining claims be DISMISSED, with prejudice.

3. Mr. Stompingbear's motion for summary judgment (*Doc. 244*) be DENIED.

4. The Clerk be directed to close this case.

Dated this 26th day of January, 2023.

_____
UNITED STATES MAGISTRATE JUDGE

.

---

security from inmates' possession of tarot cards in their cells. In his declaration, Superintendent Gibson concludes that the same security threats noted by the Court in *Singson* remain today. *Id.* at 1. Those threats include gambling, undue psychological control, bartering, and display of symbols posing a security threat. *Id.* at 5-7. Mr. Stompingbear conceded in his deposition that any cards, including tarot cards, may be used for gambling. *Doc. 256-16 at 15*.